**YAKUMITHIS et, Plaintiffs, v. VENDING MACHINE SERVICE EMPLOYEES LOCAL UNION 410-T, Defendants.**

Common Pleas Court, Lucas County.

No. 175936. Decided April 23, 1952.

Dan H. McCullough, Merrit W. Green, Toledo, for plaintiff.
Edwin J. Lynch, Moe L. Okum, Toledo, for defendants.

## OPINION

By HACKETT, J.

At the time of the decision in the La France case, the law of Ohio was stated in Parker v. Bricklayers' Union  In the order in that case the court stripped the labor union of every possible right that a free man can have in his attempts to improve his economic conditions through the proper use of the union function in labor disputes.

That was the state of the law when this case of La France Electrical Construction Company was tried in the Supreme Court. That case involved a strike in the building of the Inverness Club at Toledo by the electrical workers and plasterers and all—practically all of the building trades in Toledo. An effort was made at that time to have the court write law which would forbid all forms of picketing, whether there was violence or not.

And while this was a long, drawn-out case, the nut of the decision in that case was that peaceful picketing may not be enjoined where there is a legitimate trade dispute. That ruling is subject to certain limitations.

The briefs were voluminous, and in them we discussed and distinguished, and digested every important case on labor which had been decided or tried up until that time.

I think the La France Electrical Construction case is the Bible where the truth may be found on the question of the right to picket and under what conditions picketing may be maintained.

The most important case decided in this state since the La France Construction case is the case of Crosby v. Rath, in which Judge Lausche, of the Common Pleas Court of Cuyahoga County, following the La France Electrical Construction Company case and the reasoning in that case, enjoined all forms of picketing because he found from the evidence that no legitimate trade dispute existed in the Crosby v. Rath case.

The union appealed that case to the Court of Appeals and the Court of Appeals reversed Judge Lausche of the Common Pleas Court. The case was then taken to the Supreme Court of Ohio. The Supreme Court of Ohio reversed the Court of Appeals and affirmed the Common Pleas Court, and I think I mentioned this earlier, at least three dissenting opinions were written, a very long one by Judge Zimmerman.

The employers, the restaurant operators in that case, appealed that to the Supreme Court of Ohio. The Supreme Court of Ohio reversed the Court of Appeals of Cuyahoga County and affirmed the decision of Judge Lausche.

The unions then filed an application for a writ of certiorari in the Supreme Court of the United States and that court, examining the opinion and examining all the dissenting opinions, affirmed the Court of Common Pleas and refused to admit it. That establishes the law on picketing in the State of Ohio.

Now, there have been some cases decided by other courts since that time and in which a superficial reading of the cases would indicate that the judges attempted to hold differently and not to follow the Crosby case. It is hornbook law at the bar and bench that no court has that power. The law in the Crosby case will remain the law in Ohio until the Supreme Court of Ohio reverses it, no matter what any Akron court does or any Common Pleas sub-servient, below the Supreme Court does.

One of these judges attempted to distinguish by saying that the picketing should be permitted, peaceful picketing, because it deprived one of his Constitutional rights. The honorable court was wrong on two points: (1) He was wrong because there was no trade dispute; Therefore, there couldn't have been any picketing. (2) He was wrong because when he said

that he was granting—resting his case squarely on the Constitutional right of free speech, the Constitutional right of free speech wasn't in the case because there was no trade dispute, and even if it were in the case the law in Ohio is that the right of free speech is not superior to the liberty to conduct one's business as one sees fit without violating any statutes or ordinances. What constitutes a labor dispute is a question of state law. Obviously, bannering and picketing should be enjoined where there is no trade dispute, thereby affirming the Supreme Court of Ohio and the Supreme Court of the United States.

Now, a lot more could be said on the law in this case but, in the first place, there is no legitimate trade dispute proved in this lawsuit. There was no misunderstanding, no dispute, legitimate or illegitimate, between the plaintiffs here and this picketing group, whether it be a union or otherwise. So that, therefore, under the rule in the La France case and under the rule of the Crosby v. Rath case, picketing was unlawful and should be enjoined, as the court did enjoin it.

There is ample proof in this case that this union grew out of an unlawful conspiracy between a group of vending machine operators and a group masquerading under the name of a union which was an appendage to the vending machine operators, and part of it, and was the recipient of some of the gains that came to it. It couldn't have been a legitimate labor dispute because the object was unlawful. The object was to run this man's business their way instead of his way, and they told him to throw out of his place a juke box he wanted and put in one that they wanted him to have.

We don't look to the meaning of words only to determine the lawfulness, or otherwise, of a deal, you examine the thing from all four corners. Now, if these men in this industry wanted their condition, working condition improved, and they wanted to join with the Teamsters Union—why didn't they go to the Teamsters Union and have it done in Toledo? Why didn't they go to Harry Card or Franz Berlacher? Why didn't they go to the Central Labor Union? Was it because that wasn't the kind of deal they wanted? Was it because they knew that that kind of deal, if they had wanted it, couldn't be put over on these men in Toledo but, perhaps, it could be put over by contacting Presser and Coy?

Card and Berlacher testified in this case; their testimony wasn't needed in this case. They came here, no doubt, prompted by the fact that they were outraged at the attempt to put over this deal in Toledo.

But, this conspiracy was proved without their testimony and the right to injunction was proved without their testimony. While it added, it would have been done had they never showed up here.

And why did Flynn come here? And after he came, why didn't he have the courage to return? The fact of the matter is that Mr. Flynn doesn't know the provisions of the Constitution of his own organization. The Constitution of his own organization shows conclusively the illegality of this union. This union has no standing in Toledo and none in Cleveland and none in Indianapolis and I will prove it to you by the Constitution.

"The General President"—Article Six—"The General President shall have general supervision over the affairs of the International Brotherhood, which shall be conducted in accordance with the constitution."

"The General President, when he deems it for the best interests of the International, is hereby empowered to remove any International Organizer."

I think the President, the General President, right now has a job to do!

"Unless otherwise provided in this Constitution, the General President, or General Secretary-Treasurer, when they deem it necessary to revoke a charter shall immediately notify the members of the General Executive Board, for their approval of same."

And getting down now to the point, "Charter Members, Dues, Meetings of Locals"—Article Fourteen:

"Charter members shall consist of the names forwarded to Headquarters with the application for charter, and local unions must procure initiation stamps for all charter members, but charter members shall not be required to pay per capita tax for the month in which they receive their charter."

There isn't a scintilla of evidence in this case that anybody belonging to this union, including Presser and Coy, ever paid a dime to the International organization. There is no evidence that they ever received any charter—the evidence is to the contrary. The evidence is that they never received any charter, and there is no evidence that 410 had any right to issue a charter. As a matter of fact, Mr. Coy, I am sure, testified that there was no charter issued by 410, or anybody else, to 410-T, and I think, in response to the court's questions, and they are in the record, there is not even a piece of paper in support of it. That's probably why they didn't go to the members of the Central Labor Union in Toledo to organize.

And speaking again about charters on Page 48 of the Constitution:

"Thereupon, the General President shall consider the matter, and if he deems it for the best interests of the organization he may order and direct, subject to the approval of the General Executive Board, that a separate charter be issued to the group applying for same."

If it was a voting union why didn't they apply for it to the General President? There is no authority in the Constitution anywhere for Local 410, or any other local, to issue a charter, which issuance of a charter is solely and exclusively the power of and within the jurisdiction of the International officers.

The court sees no reason to change the order made at the conclusion of the plaintiffs' case on this temporary order. This picketing was unlawful because, in the first place, there was no trade dispute. There being no trade dispute, even peaceful picketing is enjoinable. It was unlawful because it grew out of a conspiracy between organized vending machine operators and a group of people called a union, brought together by two people from Cleveland, Presser and Coy. It's silly to say that Presser and Coy didn't receive any money. Are they working for their health or what?

The evidence clearly shows, as the court said at the end of the plaintiffs' case, that this union is simply an institution to screen the activities of this vending machine operators association which, no doubt, it intends by that scheme, to procure a monopoly on the vending machine business in Toledo, and after it procures a monopoly on the vending machine business, then to start into some other business and get a monopoly.

And that is based upon a proposition of illegality, not only because there is no proof of a trade dispute but because it constitutes a secondary boycott, and for any one of those reasons it should be and will be enjoined. This injunction will remain in force during the pendency of this action and until further hearing of the case upon its merits.